IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION

| | |
|---|---|
| CLIFTON WOODS, JR., ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Case No. |
| ) | 11-4363-CV-C-REL-SSA |
| CAROLYN W. COLVIN, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Clifton Woods, Jr., seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in failing to analyze whether plaintiff's impairments meet listing 12.05c. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

I.  BACKGROUND

On January 11, 2010, plaintiff applied for disability benefits alleging that he had been disabled since June 1, 2004. Plaintiff's disability stems from learning disabilities, knee pain, hand pain, and major depression. Plaintiff's application was denied on May 19, 2010. On February 8, 2011, a hearing was held before an Administrative Law Judge. On February 17, 2011, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On November 4, 2011, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II. STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner. The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence. 42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996). The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989). "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts. "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision." Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III. BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental

impairment which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.  Is the claimant performing substantial gainful activity?

    Yes = not disabled.
    No = go to next step.

2.  Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

    No = not disabled.
    Yes = go to next step.

3.  Does the impairment meet or equal a listed impairment in Appendix 1?

    Yes = disabled.
    No = go to next step.

4.  Does the impairment prevent the claimant from doing past relevant work?

    No = not disabled.
    Yes = go to next step where burden shifts to Commissioner.

5.  Does the impairment prevent the claimant from doing any other work?

    Yes = disabled.
    No = not disabled.

3

Case 2:11-cv-04363-REL   Document 16   Filed 02/25/13   Page 3 of 20

## IV. THE RECORD

The record consists of the testimony of plaintiff and vocational expert Robert Cox, in addition to documentary evidence admitted at the hearing.

### A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

**Earnings Record**

The record establishes that plaintiff earned the following income from 1978 through 2010:

| Year | Earnings | Year | Earnings |
|------|----------|------|----------|
| 1978 | $ 578.93 | 1995 | $ 425.00 |
| 1979 | 1,865.17 | 1996 | 20,662.43 |
| 1980 | 3,879.57 | 1997 | 9,354.55 |
| 1981 | 4,324.76 | 1998 | 0.00 |
| 1982 | 6,549.00 | 1999 | 0.00 |
| 1983 | 10,615.29 | 2000 | 7,479.45 |
| 1984 | 9,904.00 | 2001 | 389.40 |
| 1985 | 11,514.05 | 2002 | 4,454.85 |
| 1986 | 12,149.15 | 2003 | 4,017.51 |
| 1987 | 12,799.64 | 2004 | 12,582.00 |
| 1988 | 14,144.40 | 2005 | 0.00 |
| 1989 | 14,284.83 | 2006 | 0.00 |
| 1990 | 15,546.39 | 2007 | 0.00 |
| 1991 | 17,334.42 | 2008 | 0.00 |
| 1992 | 9,902.78 | 2009 | 0.00 |
| 1993 | 0.00 | 2010 | 0.00 |
| 1994 | 0.00 | | |

(Tr. at 112).

**Disability Report - Field Office**

On January 11, 2010, A. Meuir met face to face with plaintiff in connection with his disability claim (Tr. at 149-153). The interviewer observed that plaintiff had no difficulty with coherency, understanding, concentrating, talking, answering, using his hands, or writing (Tr. at 152).

**Function Report - Third Party**

On February 21, 2010, Shewanda Sanders, plaintiff's friend, completed a Function Report - Third Party (Tr. at 191-198). She stated that she spends at least 16 hours a day with plaintiff. He watches movies, runs errands for his family, helps out family and friends, gives people rides, does household repairs, and eats a lot of fast food. He goes out daily, is able to drive and goes out alone. He is able to pay bills, handle bank accounts and count change, but he cannot do the "writing part." Plaintiff's ability to handle money has not changed as a result of his impairment. Plaintiff likes to watch movies, put together cars and go to car shows. He spends time with others, both on the phone and through visits. He needs to be reminded to go to "important things like court".

Ms. Sanders indicated that plaintiff's impairment affects his ability to understand, talk, follow instructions, see, complete tasks and remember. His impairments do not affect his ability to use his hands, reach, concentrate, or get along with others. When asked how well he follows spoken instructions, she wrote, "Average but with reminders."

**Function Report - Third Party**

James Smith, plaintiff's brother, completed a Function Report - Third Party on February 22, 2010 (Tr. at 200-207). The two talk and go to lunch. Plaintiff spends his days working on friends' and family members' cars and helping out at a local body shop. When asked what plaintiff was able to do before his illness, injury or condition that he can no longer do, Mr.

5

Smith wrote, "Does not apply." Mr. Smith has observed no changes in plaintiff's cooking habits since his condition began. Plaintiff is able to dust, vacuum, do laundry and some home repairs. Plaintiff goes out every day by walking, driving, or riding in cars. He is able to go out alone. He shops in stores for clothes, food and household products. He is not able to pay bills or handle bank accounts, but he can count change.

Mr. Smith indicated that plaintiff's impairments affect his ability to understand, follow instructions, and complete tasks. His impairments do not affect his ability to use his hands, reach, remember, or concentrate. When asked how long plaintiff can pay attention, Mr. Smith wrote, "until task is completed." Plaintiff starts what he finishes. He cannot follow written instructions because he cannot read; however, with spoken instructions he can "do well with follow up instructions." He is good at handling changes in routine.

B. *SUMMARY OF SCHOOL RECORDS*

In 1969, plaintiff started school in special education classes (Tr. at 231). During the six years up until junior high, plaintiff attended school 173 day, 175 day, 172 days, 172 days, 106 days, and 67 days each year respectively (Tr. at 231). His grades all of those years in reading, spelling, writing, language, social studies and arithmetic were Ms[1] and he got one M+ in arithmetic (Tr. at 231). His junior high grades are essentially non-existent -- instead, "Special Ed" was written in the grade space. However, in 8th grade, plaintiff got an A- and a B- in math, a C- and a D+ in industrial arts, a B- and a C+ in physical education. In 9th grade he got a C+ and a D in industrial arts, and a C+ and C- in physical education.

In 10th, 11th and 12th grades, plaintiff was present 161.5 days, 168 days and 149.5 days respectively (Tr. at 232). He earned a D- in math in 10th grade and a C- in 11th grade.

---

[1] I assume plaintiff's elementary school used the E S M I F grading scale as opposed to the A B C D F scale; however, there is no explanation on this report.

He earned a D+ in language in 11th grade. The other classes listed are either illegible or it is not clear to what subject matter the initials refer; however, plaintiff's grades in 10th grade ranged from A- to D-, in 11th grade they ranged from A to D-, and in 12th grade it appears he took only one graded class in which he earned a B the first semester and a C the second semester.

Plaintiff's IQ score was tested in 1969, 1972 and 1974 when he was in elementary school and in 1977 when he was in junior high (Tr. at 232-234). During those years, his IQ measured as follows:

| | | | |
|---|---|---|---|
| 1969: | Verbal 84 | Nonverbal 70 | Overall IQ 75 |
| 1970: | Verbal 71 | Nonverbal 74 | Overall IQ 70[2] |
| 1974: | Verbal 66 | Nonverbal 93 | Overall IQ 77 |
| 1977: | Verbal 64 | Nonverbal 90 | Overall IQ 74 |

Plaintiff graduated from high school in 1981 (Tr. at 230).

C. **SUMMARY OF MEDICAL RECORDS**

On May 13, 2010, Kevin Komes, M.D., performed a consultative exam at the request of Disability Determinations (Tr. at 240-245). Plaintiff alleged problems with his knees, ankles, wrists and elbows. Plaintiff indicated that he was a boxer as a young man. Now he experiences pain in his hands about one week out of the month during which he is unable to grip objects. Plaintiff was taking no medication but rated his pain a 6 out of 10. Plaintiff had been living off his parents during the past three years and recently inherited their home.

Dr. Komes noted no swelling in any joint. He had normal strength in his upper and lower extremities. He noted that plaintiff followed commands, his demeanor was appropriate,

---

[2]I am unclear how a verbal score of 71 and a nonverbal score of 74 can equal a total score of 70; however, that is what is listed on this form. http://www.iupui.edu/~flip/wechsler.html

7

he was oriented to month, day and year, and he has a driver's license. Plaintiff's range of motion was essentially normal in his entire body. He had 5/5 grip strength bilaterally, normal upper extremity strength bilaterally, he could make a fist, he could oppose his fingers, and he could fully extend his hands. He had normal muscle strength in his lower extremities bilaterally. Dr. Komes wrote, "Complaints of wrist, elbow, knee, and ankle pain without objective finding. Based on today's evaluation, he should have no difficulty with sitting, standing, walking, lifting, carrying, handling objects, in speaking, or traveling." He diagnosed "limb pain."

On May 14, 2010, Mark Schmitz, M.S., a licensed psychologist, completed a psychological examination at the request of Disability Determinations (Tr. at 246-250). He reviewed plaintiff's school records. Plaintiff arrived alone ten minutes early, but he said his brother-in-law drove him.

> He was polite and appropriate upon introductions, and dress, grooming, and hygiene all appeared appropriate for the season and situation. There were no obvious problems noted with regard to gait, posture, or ambulation. . . .
>
> **Interview and Background Information**
> . . . Mr. Woods indicated that he was in special education classes throughout his academic career. He denied having to repeat any grades. He stated that he took medication for hyperactivity from fifth grade until approximately the ninth grade. He reported that he was frequently suspended from school for fighting. He stated, however, that he graduated from high school. Available school records indicate that he was administered a Wechsler Intelligence Scale for Children - Revised (WISC-R) at 14 years of age, and that he received a verbal IQ score of 64, a performance IQ score of 90, and a full-scale IQ score of 74. These findings would suggest the presence of specific learning disabilities, as opposed to mental retardation. When asked, he stated that he had to take the driving test twice to pass it, and that the written portion had to be read to him. He stated that he continues to be functionally illiterate. He indicated that his brother and former employer help him read his mail, legal papers, et cetera. . . .
>
> With regard to employment history, Mr. Woods stated that after graduating from high school he was employed as a custodian at the University of Missouri for 9 or 10 years. He was also employed for 15 or 16 years in auto body work. He stated, however, that his employer had to let him go in 2005 or 2006 because he was unable to obtain a certificate in bodywork as a result of his illiteracy. He indicated that his old employer

8

still gives him a little work on the side every now and then. Mr. Woods also stated that he was a professional welterweight boxer for 13 years until quitting the profession at age 36. . . . He indicated that at 24 or 25 years of age he was hospitalized with a severe concussion and swelling of the brain. . . . He indicated that he has a lot of problems with his memory now. . . .

Mr. Woods stated that he was married at 25 or 26 years of age, and that he and his wife are still technically married, but they have been separated for many years. He stated that his wife is more like a friend now, and she will let him stay with her if he needs a place to stay. He indicated that he has five children, a 27-year-old son and a 25-year-old daughter by his wife, as well as a 16-year-old daughter and 17 and 10-year old sons from relationships outside of marriage. He indicated that all of his children are being raised by their mothers. Mr. Woods stated that he had been staying with his parents until they both died last year, and he is currently living in a small trailer home next to his mother's house. He indicated that his brother has rented out his mother's house to others.

. . . During the course of the day he might "tinker with a car" or "piddle with things". He also stated that he tends to watch a lot of movies. . . .

Summary
. . . The results of the current examination indicate that he is suffering from a depressive disorder of moderate proportions. He also appears to have learning disorders, specifically reading disorder and disorder of written expression. Additionally, although he reports having some memory difficulties, these do not appear to be sufficiently problematic as to warrant an additional diagnosis at this time.

In terms of the referral questions, Mr. Woods appears to have no restrictions with regard to daily activities, with the exception of an inability to read or write. He appears capable of understanding and remembering instructions, although these would need to be given verbally as a result of his illiteracy. His depression does not appear to be sufficient to significantly interfere with his ability to sustain concentration and persistence of tasks. He also appears capable of interacting in a socially appropriate and adaptable manner. Finally, if disability benefits are allowed, Mr. Woods appears capable of managing any resulting funds in his own behalf.

The diagnoses included the following: major depressive disorder, single episode, moderate; reading disorder; disorder of written expression, and a GAF of 55.[3]

On May 19, 2010, Paul Stuve, Ph.D., completed a Mental Residual Functional Capacity Assessment (Tr. at 252-254). He found that plaintiff suffers from no mental limitations other

---

[3] A global assessment of functioning of 51 to 60 means moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers).

9

than moderate limitations in the following:

- The ability to understand and remember detailed instructions
- The ability to carry out detailed instructions
- The ability to respond appropriately to changes in the work setting

That same day, Dr. Stuve completed a Psychiatric Review Technique finding that plaintiff has moderate restriction in activities of daily living; mild difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and has suffered no episodes of decompensation (Tr. at 255-265). In support, he wrote the following:

> Claimant is 47 y/o alleging inability to read and write and learning disability. Past relevant work includes custodial services and auto body laborer. ADLS [activities of daily living] include easy meals, household chores, is able to handle finances but needs bills/documents read to him, helps friends with car repairs, visits, watches tv.
>
> School records show prior IQs in the 60s and 70s, in a pattern suggestive of a Learning Disability rather than mental retardation. He has a history of special education services.
>
> There is no MSS addressing his mental allegations. At the current CE the claimant was alert and oriented, pleasant and cooperative, with adequate memory and concentration. Speech and thought processes were intact. There was no psychosis. He reported depressed mood, irritability, and periodic crying spells. He is grieving the loss of his parents. He also reports feeling like a failure, and embarrassed to be borrowing money from his children. The examiner related to his inability to read and write. He appears capable of understanding and remembering instructions, though they need to be given verbally. Depression does not appear to be sufficient to significantly interfere with his ability to sustain concentration and persistence in tasks. He appears capable of interacting in a socially appropriate and adaptable manner. He was diagnosed with Major Depression, Reading Disorder, and disorder of Written Expression.

D.  *SUMMARY OF TESTIMONY*

During the February 8, 2011, hearing, plaintiff testified; and Robert Cox, a vocational expert, testified at the request of the ALJ.

1. **Plaintiff's testimony.**

Plaintiff was asked what his biggest limitation is with respect to working full time, and he said, "Basically reading and writing" (Tr. at 29). Plaintiff cannot read and write (Tr. at 30). He completed high school but was enrolled in special education classes (Tr. at 30). Plaintiff said he works on cars, but he cannot get a job in that area because he is unable to read "certain stuff that goes in the car" (Tr. at 30). Plaintiff's girl friend tried to teach him to read and write, but he has not tried any program for literacy (Tr. at 31).

Plaintiff also suffers from hand pain which is improved with Aleve, but he has problems holding things (Tr. at 32-33). Plaintiff's knee swells up about every month or two (Tr. at 38). That causes him to limp (Tr. at 38). He takes Aleve and Advil and the swelling goes down after about a week (Tr. at 39). Cold weather aggravates plaintiff's physical problems (Tr. at 43).

Plaintiff's parents passed away during the last few years, and when that happened his depression was aggravated (Tr. at 33-34). Not having any money aggravates plaintiff's depression (Tr. at 34). Praying makes it better (Tr. at 34). He does not know whether his depression limits his ability to focus and concentrate, but his memory is impaired (Tr. at 35). Plaintiff believes he inherited memory problems (Tr. at 35). When asked to give an example of his memory problems, he said one time he was putting on a water pump and wound up with one extra screw, so he had to tear it all out to see where he had forgotten to put in a screw (Tr. at 36-37). When asked to describe a bad day with respect to his memory problems, plaintiff said:

> Seems like everything is all happening wrong or -- and it's like you woke up on the wrong side of the bed, like, normal. And it's, like -- and it just -- when it -- everything bad starts to happen or, you know, just bad here and there, just little intimate things. You try to take a deep breath to breathe it in and breathe it out and say it's got to get better, this is not happening. It's, like, okay.

(Tr. at 37). Plaintiff sometimes has to be by himself and take some time away from others (Tr. at 37). When asked how long it takes before he feels better he said he did not know, that he will pop in a movie or ask God to help him through the day (Tr. at 38).

Plaintiff received a head injury from boxing (Tr. at 46).

Plaintiff can sit for 45 minutes at a time, he can lift 45 pounds (Tr. at 30). He has a driver's license and drives (Tr. at 40). If his hand hurts, he uses his left hand (Tr. at 40). Plaintiff lives alone in a mobile home and does yard work (Tr. at 40). If his hand is not hurting, he can cut the grass (Tr. at 40). Plaintiff's daughter does his laundry, and he eats fast food instead of cooking (Tr. at 40). Plaintiff used to work out a lot, but he cannot do that anymore (Tr. at 41). He goes to church occasionally on Sundays (Tr. at 41). He socializes with friends about every three or four days (Tr. at 41). Plaintiff can pay attention for 45 minutes to an hour at a time (Tr. at 43).

Plaintiff is currently working as a handyman at an auto body shop (Tr. at 41). Plaintiff worked for him about 11 years ago (Tr. at 41-42). Plaintiff's last job was in 2003 or 2004 at The Car Doctor in St. Louis (Tr. at 42). He left that job because his "handicap showed up" (Tr. at 42). Because he could not work a computer, the people there were "taunting" him and he could not take that, so he quit (Tr. at 42). Plaintiff had gotten into verbal arguments with coworkers (Tr. at 42-43).

### 2. Vocational expert testimony.

Vocational expert Robert Cox testified at the request of the Administrative Law Judge. Plaintiff's past relevant work includes working at a body shop, classified as DOT 807.381-010, a medium-exertion job which is semi-skilled (SVP 3) (Tr. at 45). He also worked as a lawn care laborer, DOT 929.687-030, which is heavy and unskilled (SVP 2) (Tr. at 45).

The first hypothetical involved a person with no exertional limitations but limited to simple, routine, and repetitive tasks, could not perform in a fast-paced production environment, could only make simple decisions and could deal with few workplace changes. The person would be limited to occasional interaction with supervisors, coworkers and the general public, and the person should be considered unable to read, write and do more than simple math (Tr. at 46).

The vocational expert testified that such a person could perform plaintiff's past relevant work as a lawn care worker (Tr. at 46). The person could also perform "most of the unskilled medium and heavy exertion jobs" with examples being car wash dryer, DOT 915.667-010, medium unskilled with 250,000 in the nation and 4,500 in Missouri; transplanter (which is someone working in landscaping), DOT 405.687-018, medium unskilled with 300,000 in the country and 6,000 in Missouri; hospital cleaner, DOT 323.687-010, light unskilled with about 400,000 in the country and 9,000 in Missouri; hand packager, DOT 700.687-026, a sedentary position with 288,000 in the country and 6,700 in Missouri (Tr. at 47-48).

The second hypothetical was the same as the first except the person would be "completely unable" to use his right hand to grasp or manipulate objects several times during the workweek (Tr. at 49). Because these jobs are primarily manual labor, such a restriction would probably exclude all of them (Tr. at 49).

The third hypothetical was the same as the second, except the person frequently had memory problems and was "unable to remember tasks that they might have been working on 15, 20 minutes prior" (Tr. at 49). Although the addition of a restriction to a hypothetical which already excluded all employment seems confusing, the vocational expert testified that

this newest restriction would preclude employment by itself because "it would be in excess of the 80 percent time on task" (Tr. at 50).

Employers will allow no more than two absences a month; workers get 15 minutes to rest in the morning, an hour for lunch, and 30 minutes in the afternoon; and the worker needs to be able to attend to what he is doing for at least 80 percent of the time (Tr. at 48).

## V.    *FINDINGS OF THE ALJ*

Administrative Law Judge John Sullivan entered his opinion on February 17, 2011 (Tr. at 10-18). Plaintiff's last insured date is December 31, 2006; therefore, plaintiff must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits (Tr. at 10, 12).

Step one. Plaintiff has not engaged in substantial gainful activity since his alleged onset date (Tr. at 12).

Step two. Plaintiff suffers from the following severe impairments: major depressive disorder, reading disorder, and disorder of written expression (Tr. at 12). "Dr. Schmitz noted that his scores suggest the presence of a learning disability, as opposed to mental retardation." (Tr. at 12). Plaintiff's knee, ankle, wrist, and elbow pain are without objective finding and are not severe (Tr. at 13).

Step three. Plaintiff's impairments do not meet or equal a listed impairment (Tr. at 14). The ALJ considered listing 12.04 because of plaintiff's major depressive disorder but found that plaintiff's impairments do not meet or equal that listing because they do not cause at least two "marked" limitations or one "marked" limitation and repeated episodes of decompensation (Tr. at 14).

Step four. Plaintiff retains the residual functional capacity to perform a full range of work at all exertional levels except he is limited to simple, routine, repetitive tasks, not

Case 2:11-cv-04363-REL    Document 16    Filed 02/25/13    Page 14 of 20

performed in a fast-paced production environment, involving only simple work-related decisions and in general relatively few work placed changes. In addition, plaintiff is restricted to occasional interaction with supervisors, co-workers, and the general public and is unable to read, write or do more than simple math (Tr. at 15). With this residual functional capacity plaintiff can perform his past relevant work as a lawn care worker (Tr. at 17).

Step five. Alternatively, the ALJ found that plaintiff could perform the following jobs, all available in significant numbers: car wash dryer, transplanter, hospital cleaner, and hand packager (Tr. at 18). Therefore, plaintiff was found not disabled at both the fourth and fifth steps of the sequential analysis.

## VI.     *LISTING 12.05C*

Plaintiff argues that the ALJ erred in failing to analyze or discuss whether plaintiff's impairments meet or equal listing 12.05c.

The Eighth Circuit has interpreted Listing 12.05c -- mental retardation -- to require a claimant to show each of the following three elements: "(1) a valid verbal, performance, or full scale IQ score of 60 through 70, (2) an onset of the impairment before age 22, and (3) a physical or other mental impairment imposing an additional and significant work-related limitation of function." McNamara v. Astrue, 590 F.3d 607, 610-611 (8th Cir. 2010), quoting Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006).

Plaintiff's IQ score. Plaintiff argues that because in 1977 when he was 14, his verbal IQ was measured at 64, he has met the first prong of the listing requirement. Defendant argues, however, that IQ test results obtained between ages 7 and 16 are only considered current for two years.

20 C.F.R. pt. 404, subpt. P, app 1, § 112.00C(10) provides as follows:

> IQ test results must also be sufficiently current for accurate assessment under 112.05. Generally, the results of IQ tests tend to stabilize by the age of 16. Therefore, IQ test

15

results obtained at age 16 or older should be viewed as a valid indication of the child's current status, provided they are compatible with the child's current behavior. IQ test results obtained between ages 7 and 16 should be considered current for 4 years when the tested IQ is less than 40, and for 2 years when the IQ is 40 or above. IQ test results obtained before age 7 are current for 2 years if the tested IQ is less than 40 and 1 year if at 40 or above.

In this case, plaintiff's IQ was tested four times: In 1969, 1972 and 1974 when he was in elementary school and in 1977 when he was in junior high. During those years, his IQ measured as follows:

| | | | |
|---|---|---|---|
| 1969, age 6: | Verbal 84 | Nonverbal 70 | Overall IQ 75 |
| 1970, age 7: | Verbal 71 | Nonverbal 74 | Overall IQ 70 |
| 1974, age 11: | Verbal 66 | Nonverbal 93 | Overall IQ 77 |
| 1977, age 14: | Verbal 64 | Nonverbal 90 | Overall IQ 74 |

Plaintiff's IQ was never tested after age 14. Because that score was only valid for two years, it is not sufficient for the listing requirement.

Additionally, plaintiff's verbal IQ score was also measured as high as 84, which is significantly above the score cited by plaintiff lending even less validity to the score measured in 1977.

> The listing for mental retardation, Listing 12.05, 20 C.F.R. Pt. 404, Subpt. P., App. 1 (2001), describes mental retardation as, "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." ... We have emphasized in the past that IQ scores must be valid, that the Commissioner need not rely exclusively on IQ scores, and that the Commissioner may disregard test scores that are inconsistent with an applicant's demonstrated activities and abilities as reflected in the record as a whole. Muncy v. Apfel, 247 F.3d 728, 733 (8th Cir. 2001); Clark v. Apfel, 141 F.3d 1253, 1255 (8th Cir. 1998).

Clay v. Barnhart, 417 F.3d 922, 928-929 (8th Cir. 2005). The substantial evidence in the record here conflicts with the verbal IQ score of 64 obtained when plaintiff was a child.

16

Plaintiff graduated from high school. He worked at the substantial gainful activity level for 16 years, and his profession was semi-skilled. The ability to hold a job is "particularly useful in determining the individual's ability or inability to function in a work setting." Williams v. Sullivan, 970 F.2d 1178, 1184-1186 (3rd Cir. 1992) (quoting 20 C.F.R. pt. 404, subpt. P, app 1, § 12.00D). Plaintiff quit has last job because people taunted him. Plaintiff continued to work on cars for family and friends up to the time of his administrative hearing. On January 11, 2010, A. Meuir observed no problems with coherency, understanding, or concentrating. On February 21, 2010, Shewanda Sanders stated that plaintiff does household repairs, drives alone on a daily basis, is able to pay bills and handle bank accounts (except not the writing part), and can make change. On February 22, 2010, James Smith stated that plaintiff works on cars and helps out at a body shop; he said there is nothing that plaintiff used to be able to do that he can no longer do (which is significant, given plaintiff's 16 years of working at the substantial gainful activity level and in a semi-skilled position), he does home repairs, he goes out alone every day, he can count change, and he can follow spoken instructions.

The record establishes that plaintiff cannot read or write. He testified that he has never tried a program for literacy, rather his girl friend tried to teach him at some point in his adult life. Illiteracy does not equal mental retardation. Plaintiff's employment history, his ability to live alone, and his daily activities do not support a finding of such severe mental limitation.

<u>Physical or other mental impairment imposing an additional and significant work-related limitation of function</u>. Plaintiff argues that this requirement is met by his major depressive disorder which results in deficits in adaptive functioning: he lived with his parents until they died; his friend, siblings and children come to his home to help with chores and

17

paying his bills; plaintiff needs assistance with reading mail; he lost a job because he could not understand the written testing required to advance in the position; and he has only worked at the substantial gainful activity level for two years his entire life.

First, defendant pointed out in her response that plaintiff has actually worked at the substantial gainful activity level for 16 years, not for two. Plaintiff testified that he quit his job because people were taunting him about his inability to read, he did not say he lost the job because he did not qualify for an "advance" in position as argued by plaintiff in his brief.

The "additional limitation" need not be disabling, but it must have a more than slight or minimal effect on the claimant's ability to perform work. McNamara v. Astrue, 590 F.3d at 611; Sird v. Chater, 105 F.3d 401, 403 (8th Cir. 1997). Plaintiff has alleged an additional impairment from major depressive disorder. In February 2011, plaintiff described his depression has having started in the last three years due to losing family members (Tr. at 33, 34). This would have been in approximately early 2008. The ALJ indicated that plaintiff must establish a disability prior to December 31, 2006, in order to be eligible for benefits. Plaintiff never described any symptoms of depression prior to "three years" before his administrative hearing. He also testified that when his parents got sick, he "took care of them" which is inconsistent with disability. His father was in his 80s and "couldn't do anything on his own" and so plaintiff was always there to help his father and they were together all the time. When asked if there are limitations because of his depression, plaintiff testified that he spends more time by himself, and his kids are embarrassed by him. Not having money aggravates his depression. He said that his depression does not limit his ability to focus and concentrate (Tr. at 35).

The evidence establishes that plaintiff goes out every day. He gives rides to family and friends, he fixes people's cars, he works as a handyman when needed, he visits with family

and friends. Therefore, his statement that he spends more time by himself does not establish any type of limitation on his ability to perform work. How his children feel about him is irrelevant. And being depressed over not having any money is not relevant to whether plaintiff is capable of performing work activities.

No physician has ever found any work-related limitations due to plaintiff's major depressive disorder, and he did not testify about any work-related limitations due to his major depressive disorder. As a result, plaintiff has not satisfied this prong.

Because there was no evidence of a 12.05c listing, the ALJ was not required to discuss it. See McNamara v. Astrue, 590 F.3d 607, 611-612 (8th Cir. 2010), wherein the claimant had argued that obesity was a physical impairment imposing an additional and significant work-related limitation of function under listing 12.05c:

> While obesity can impose a significant work-related limitation, substantial evidence supports the ALJ's rejection of McNamara's claim. Nothing in McNamara's medical records indicates that a physician ever placed physical limitations on McNamara's ability to perform work-related functions because of her obesity. See Forte v. Barnhart, 377 F.3d 892, 896 (8th Cir. 2004). Dr. Wy diagnosed McNamara as obese in his 2006 evaluation and noted limitations in her forward flexion due to her obese abdomen, but nothing in his report suggested her obesity significantly affected any work-related functions. McNamara's own Function Report also failed to identify any physical limitations caused by obesity. In this report, McNamara stated that she had no limitations lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, or climbing stairs, and nowhere in the report did she mention any other restrictions stemming from her weight.
>
> McNamara's failure to testify at her hearing before the ALJ about any work-related limitations caused by her obesity further undermines her claim. See Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir.2003).... Given that neither the medical records nor McNamara's testimony demonstrates that her obesity results in additional work-related limitations, it was not reversible error for the ALJ's opinion to omit specific discussion of obesity. Forte, 377 F.3d at 896–97.

Similarly, in this case because there was no evidence in the record to support a 12.05c listing (and because neither plaintiff nor his attorney mentioned such a listing prior to the ALJ's determination), the ALJ was not required to address that listing in his order.

19

## VIII. CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied. It is further

ORDERED that the decision of the Commissioner is affirmed.

/s/ Robert E. Larsen
ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
February 25, 2013